# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| In re:<br>**CHRISTOPHER DEE COTTON**<br>**ALLISON HEDRICK COTTON**<br><br>**Debtors**<br><br>**CHRISTOPHER DEE COTTON,**<br>**ALLISON HEDRICK COTTON,**<br>**IGNACIO PEREZ, and**<br>**GABRIELA PEREZ,**<br>*on behalf of themselves and all*<br>*others similarly-situated*,<br><br>**Plaintiffs,**<br><br>v.<br><br>**WELLS FARGO & CO.** and<br>**WELLS FARGO BANK, N.A.**<br><br>**Defendants.** | § § § § § § § § § § § § § § § § § § § § § § | Case No. 14-30287<br>Chapter 13<br><br><br><br><br>Adv. Proceeding No. 17-03056<br><br>District Court Case No. 18-00499 |

### DECLARATION OF JOHN RAO

I, John Rao, hereby declare, under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. This Declaration is submitted in support of the Plaintiffs' request for an award of fees and expenses for work by Class Counsel related to the settlement of this action, and in support of Plaintiffs' motion seeking approval of the class action settlement.

2. I am an attorney at the National Consumer Law Center (NCLC) in Boston, Massachusetts.

1

3. I have been a member of the bar of the Supreme Court of Rhode Island since 1982. I am also admitted to the bar of the United States District Court, District of Rhode Island, the First Circuit Court of Appeals, and the United States Supreme Court.

4. I graduated from the Hastings College of Law - University of California in 1982, and from Boston University in 1978.

5. I have had considerable experience in the area of bankruptcy and mortgage servicing. From 1982 to 1996, I served as head of the Consumer Unit at Rhode Island Legal Services, and also as a managing attorney in two of its branch offices. My practice included a broad range of cases dealing with consumer, bankruptcy and utility issues, requiring representation of low-income clients before federal, state and bankruptcy courts, and before administrative agencies. During that time, I represented numerous individual consumer debtors in chapter 7 and chapter 13 bankruptcy cases.

6. Since 1996, I have been an attorney with the National Consumer Law Center (NCLC) and focus on consumer credit, mortgage servicing, and bankruptcy issues.

7. I have had considerable experience litigating cases involving consumer law and bankruptcy issues. I served as co-counsel in one of the initial class action cases dealing with bankruptcy reaffirmation abuses. The litigation resulted in an extremely beneficial settlement for consumers, and NCLC was referred to by the court in that case as the "leading non-profit low-income consumer advocacy organization in the country." Memorandum and Order, January 27, 1999, Mazola, et al v. The May Department Stores Company, United States District Court for the District of Massachusetts, 97-CV-10872-NG (J. Gertner).

8. While at NCLC, I have testified in Congress on mortgage servicing, loan modification, and bankruptcy matters, in hearings conducted by House and Senate subcommittees. Members of Congress and their staff frequently request that I assist them in the development of proposed mortgage servicing and bankruptcy legislation.

9. I was a member of the federal Judicial Conference Advisory Committee on Bankruptcy Rules from 2006-2012, appointed by Chief Justice John Roberts. I provided a leadership role in the development of bankruptcy rules dealing with the treatment of home mortgage claims in Chapter 13

2

cases (Bankruptcy Rule 3002.1 and amendments to Rule 3001) and related Official Forms. Following the completion of my two, three-year terms on the Committee, I remained until 2014 as a member of the Committee's working group on the development of a national model Chapter 13 plan proposal and the Bankruptcy Forms Modernization project. I am currently serving as a consultant to the Committee on a project to restyle the bankruptcy rules.

10. From 2007-2014, I was a member of the United States Bankruptcy Court for the District of Massachusetts Advisory Committee on Local Rules.

11. In 2009, I was appointed to the committee formed by the United States Department of Treasury to provide proposals for the treatment under the HAMP mortgage modification program of borrowers who are in bankruptcy. The proposals of the committee, comprised of mortgage industry, Chapter 13 trustee and consumer representatives, were included in Treasury's guidelines for the servicing of borrowers under the HAMP program.

12. In 2014, I was invited by the Consumer Financial Protection Bureau (CFPB) to participate with mortgage servicing industry representatives in a roundtable discussion of a proposed regulation on providing periodic mortgage statements to borrowers in bankruptcy. Several of the positions adopted at the roundtable, including those related to the information on statements for debtors in Chapter 13 cases, were included in the CFPB's final regulation. I also drafted detailed comments and consulted with CFPB rule making staff on the proposed periodic statement regulation. I have submitted extensive comments to the CFPB in several other rule making dockets involving proposed loss mitigation and mortgage servicing regulations, and have been asked by the CFPB to provide input on specific provisions of proposed servicing regulations.

13. In 2017, I was appointed as a Commissioner for the American Bankruptcy Institute's Commission on Consumer Bankruptcy. The ABI Commission is charged with researching and recommending improvements to the consumer bankruptcy system that can be implemented within its existing structure. As a commissioner, I have helped develop several recommendations on the treatment of loan modifications in bankruptcy cases and suggestions for improving Bankruptcy Rule 3002.1. The Commission's final report containing its recommendations will be issued in Spring, 2019.

14. I frequently appear as a speaker and panelist at national conferences held by the National Conference of Bankruptcy Judges (NCBJ), National Association of Chapter 13 Trustees, National Association of Consumer Bankruptcy Attorneys, American Bankruptcy Institute, as well as numerous local and regional trainings. I have on two occasions served on the NCBJ education committee charged with planning its annual conferences. I have appeared as a speaker at seminars provided exclusively for bankruptcy judges organized by the Federal Judicial Center (FJC). I also appeared in a video production sponsored by the FJC on loss mitigation mediation programs that was made available to bankruptcy judges. In 2017, I received the NCBJ Excellence in Education award.

15. I am a conferee of the National Bankruptcy Conference and a fellow of the American College of Bankruptcy. I am also a member of the Board of Editors of Collier on Bankruptcy, member of the Board of Directors of the National Consumer Bankruptcy Rights Center, and former member of the Board of Directors of the National Association of Consumer Bankruptcy Attorneys (2001-2016) and the American Bankruptcy Institute (2006-2008). I was an adjunct faculty member at Boston College School of Law from 2008 to 2011, teaching a course on consumer bankruptcy.

16. I am a contributing author to Collier on Bankruptcy and the Collier Bankruptcy Practice Guide. In the Collier on Bankruptcy treatise, I am the current author of Chapter 362 Automatic Stay, Chapter 522 Exemptions, and the chapters on the 3000 series of the Bankruptcy Rules, including Chapter 3002.1 Notice Relating to Claims Secured by Security Interest in the Debtor's Principal Residence.

17. I am editor and contributing author to Consumer Bankruptcy Law and Practice, NCLC Consumer Credit and Legal Practice Series (11th Ed. 2015). I am a co-author of all five editions of NCLC's treatise entitled Foreclosures and Mortgage Servicing, NCLC Consumer Credit and Legal Practice Series (5th Ed. 2014), which includes a chapter I author on federal mortgage servicing law.

18. I have submitted reports and provided testimony as an expert witness on a variety of consumer and bankruptcy issues, in the following cases: Ronnie and Joan McKinney, United States Bankruptcy Court, District of Nevada, Case No. BK-N-10-50597-BTB; Matthew and Amber Benner, Debtors, United States Bankruptcy Court, Northern District of Indiana, South Bend Division, Case No.

15-31477; Jeremy D. Ruehle vs. Ocwen Loan Servicing, LLC, et al, District Court Of Cleveland County, State Of Oklahoma, Case No. CJ-2015-867; Larry I. Milder, Plaintiff Vs. Landmark American Insurance Co., State of Rhode Island Superior Court, C.A. No. PC 2015-3475; Roy and Jennifer Burris vs. Ocwen Loan Servicing, L.L.C., et al., United States District Court, Western District of Oklahoma, No. CIV-16-120-R; Arnold and Lynell Pinkney vs. Roundpoint Mortgage Serving Corp., et al., United States District Court, Western District of Washington, No. 15-cv-00260-TSZ; Cythina and Samuel Chy vs. Taing, et al., Middlesex Superior Court, Commonwealth of Massachusetts, C.A. No. 1581-CV-06781; Benoit Dorvil v. Woodbridge Sterling Capital, et al., Suffolk Superior Court, Commonwealth of Massachusetts, C.A. No. 00-3905-B; James P. Knapp and Pamela K. Knapp v. American General Finance, Inc., United States District Court, District of W. Va., C.A. No. 2:99-0571; Lonnie C. Kirk, Jr. and Dora Kirk v. American General Home Equity, Inc., Circuit Court of Bonne County, W.Va., C.A. No. 96-C-141; Robert W. Perkins v. Accredited Home Lenders, Inc., Superior Court, District of Columbia, PR No. 00ca002486; Clark v. Wells Fargo National Bank, Bankruptcy Court, C.D. Cal., Ca. No. LA00-11658-VZ.

19. In my experience, this case involves novel and complex issues in highly specialized areas of law. One such area concerns the treatment of home mortgages in Chapter 13 cases and the application of Bankruptcy Rule 3002.1. This rule is intended to facilitate the exchange of information between mortgage creditors, debtors and trustees in cases in which debtors are attempting to cure a mortgage default and maintain ongoing payments in accordance with 11 U.S.C. § 1322(b)(5). The rule is designed to ensure that debtors and trustees are given accurate information about the amount of postpetition payment obligations, so as to prevent unexpected deficiencies in a mortgage when a Chapter 13 case is completed. *See* Fed. R. Bankr. P. 3002.1 Advisory Comm. Note (2011); *In re* Galindez, 514 B.R. 79, 105 (Bankr. D.P.R. 2014); *In re* Tollios, 491 B.R. 886, 888 (Bankr. N.D. Ill. 2013); *In re* Thongta, 480 B.R. 317, 319 (Bankr. E.D. Wis. 2012); *In re* Carr, 468 B.R. 806, 807–08 (Bankr. E.D. Va. 2012); *In re* Jackson, 446 B.R. 608, 610 (Bankr. N.D. Ga. 2011).

20. It is critically important that debtors in mortgage cure cases maintain ongoing payments during the case. Thus, it is common practice for attorneys to advise debtors that they should expect to

5

receive payment change notices from their mortgage servicer during their case and that in districts in which mortgage payments are made directly by debtors, they must begin paying the new payment amount stated in the notice on the designated start date in order to avoid dismissal of their case or the granting of stay relief to allow a foreclosure.  The process creates an expectation by debtors that accurate information about payment changes will be provided by mortgage servicers and that compliance with payment change notice is mandatory.  Payment change notices are not viewed by participants in Chapter 13 cases as conditional or permissive, rather they command the debtor to begin making payments at the new amount (subject only to objection if a party believes the new payment amount is not required by the contract terms).

21. By making use of the payment change procedures under Bankruptcy Rule 3002.1(b) and the Official Bankruptcy Form 410A, Notice of Mortgage Payment Change, Wells Fargo gave its no-application modification practices an appearance of legitimacy.  The official form payment change notices sent by Wells Fargo for no-application modifications were largely indistinguishable from notices routinely sent to debtors when there are interest rate and escrow changes on their mortgage accounts.  Not surprisingly, consumer debtors, their attorneys, and Chapter 13 trustees who received these payment change notices assumed that the new payment amount, lower in most cases, was based on the existing contractual loan terms related to interest adjustment or escrow account analysis, and therefore should be paid.  Even those debtors who may have noticed in Part 3 of the form that another reason for the change was listed may still have felt compelled to pay the new amount for fear of jeopardizing their case.

22. Plaintiffs have appropriately described the Wells Fargo's no-application loan modification practices as "stealth."  The use of official bankruptcy forms made it difficult for consumer debtors, their attorneys, and Chapter 13 trustees to understand the nature of the practices and the extent of harm caused by them.  Only through the substantial discovery conducted by Class Counsel was the full extent of Defendant's unlawful practices uncovered.  For example, consumer debtors, their attorneys, and Chapter 13 trustees could easily assume that continued payments to Wells Fargo in accordance with their Chapter 13 plans, without more, would not result in acceptance of a

6

trial payment plan or permanent loan modification. However, Class Counsel's discovery revealed that debtors were in fact unwittingly put into trial loan modifications without express consent.

23. In addition to giving the no-application modification practices a cloak of apparent legitimacy, Rule 3002.1 was used by Wells Fargo to carry out a scheme to fraudulently induce debtors to enroll in unwanted loan modifications. Class Counsel determined that class members were sent payment change notices accompanied by attached letters and statements that falsely represented that they had missed payments or made late payments, and falsely suggested that their mortgages and Chapter 13 cases were no longer in good standing. As a member of the Advisory Rules Committee and one of the principal drafters of Rule 3002.1, I could not possibly have imagined that the rule's remedial purpose would be manipulated in this manner or that it would be used against debtors to perpetuate the unlawful practices described in Plaintiff's complaint.

24. Many practicing lawyers would be challenged by the issues presented in this case, because they are at the intersection of bankruptcy and loss mitigation practice. Attorneys who handle mortgage servicing cases, but lack knowledge of bankruptcy, would be hamstrung in understanding the nuances of Chapter 13 practice and the impact a potential nationwide settlement would have on debtors. For example, such counsel would not be aware of the different ramifications of Wells Fargo's no-application modification program in districts in which Chapter 13 trustees disburse ongoing mortgage payments (conduit) and those in which debtors pay directly, particularly with respect to how a debtor or Chapter 13 trustee would respond to a payment change notice. Similarly, bankruptcy counsel not familiar with loss mitigation, particularly the use of trial payment plans (TPP) and practices related to the conversion of TPPs to permanent loan modifications, would have been challenged in identifying the unlawful practices, determining appropriate legal claims, and crafting targeted discovery.

25. As a frequent speaker at national and local conferences on bankruptcy and mortgage servicing issues, and in my leadership roles in bankruptcy and consumer organizations, I have had occasion to become familiar with many lawyers throughout the nation who practice in these different areas. Based on this experience, I have observed that there are very few attorneys who are skilled in

both practice areas. Thus, it is my opinion that Class Counsel in this case were uniquely qualified to represent the class because they have knowledge and experience in both bankruptcy and loss mitigation. This brought efficiency to the handling of the case, ensuring that time spent by Class Counsel directly benefitted the class at all times.

26. This case also presented unusual and difficult questions in defining the class, that again required a unique understanding of Chapter 13 practice. The status of Chapter 13 cases can vary considerably during the time they are in the bankruptcy system and during the relevant time period of this case. Some class members' cases were dismissed or Wells Fargo had been granted relief from the automatic stay to foreclose on the property. Other debtors' cases were successfully completed and were closed. Some of the debtors' mortgages were paid off through refinancing or sale of the property, or the servicing of their loans was transferred to a servicer other than Wells Fargo. Some class members are current with their plan payments and others may be attempting to cure both pre- and post-petition defaults. Some of the class members are still in active Chapter 13 bankruptcies, and most are still making payments on their mortgage loans. All of these variations required a careful drafting of the class definition by Class Counsel and the appropriate use of targeted subclasses. These factors were also appropriately considered by Class Counsel in determining the cash settlement distribution amounts, as discussed below.

27. Other matters also needed to be considered. For example, the impact of a consensual mortgage modification can vary in Chapter 13 cases. Since it is typically the largest debt in a Chapter 13 case, a consensual mortgage modification not only changes the terms of a mortgage but will often require other adjustments to the debtor's Chapter 13 plan. If the loan modification reduces the monthly mortgage payment, the trustee may seek to have the freed-up income used to increase plan payments to other creditors. This may also occur if the loan modification eliminates an arrearage that was being paid under the plan. These issues become more challenging in this case where class members were subjected to non-consensual modifications, undertaken without court supervision. The proposed settlement reflects that these matters were properly considered by Class Counsel in fashioning the relief for class members.

8

28.     The other area in which Class Counsel's experience and knowledge created value for the class related to bankruptcy class action practice. Quite simply, nothing about bankruptcy class action practice is routine or formulaic. The law in this area in unsettled, particularly as it relates to nationwide class actions. This case also involved proceedings in several bankruptcy courts and this court. There are few attorneys other than Class Counsel who have experience in successfully handling bankruptcy class actions.

29.     The final work product of Class Counsel shown in the record of this case reflects an exceptional degree of skill and knowledge, producing outstanding results. In evaluating the success of mortgage-related litigation, unlike other types of consumer litigation, it is often necessary to consider non-monetary relief. Particularly when the challenged practice has caused class members to have payment problems, a settlement that gives class members injunctive or other relief that will help them avoid default and foreclosure can be critically important. In mortgage litigation, this type of relief can have a far greater positive impact on class members than monetary relief.

30.     In my opinion and based on my experience, the proposed settlement provides exceptional relief for class members. In addition to the common fund, the settlement in this case has afforded class members significant injunctive relief. Wells Fargo agreed to a "moratorium" in which it has refrained from pursuing relief from the bankruptcy automatic stay and from foreclosing on the class members' homes until after the settlement funds are distributed. This will give class members time to use the settlement funds to cover post-petition arrearages that may have been incurred as a result of Wells Fargo's improper loan modification solicitations and Rule 3002.1 payment change notices, and thereby avoid Chapter 13 case dismissals or home foreclosures. More importantly, the efforts of Class Counsel have caused Wells Fargo to end its practice of unilaterally imposing unwanted trial loan modifications on Chapter 13 debtors. This extremely successful outcome for class members is an important factor I have considered in concluding that the fee request in this case is reasonable.

31.     The monetary relief is also significant, with a majority of class members receiving in excess of $2,200.00 in cash. Approximately 1,000 members included in Subclass 2 will receive a check in the amount of $3,800.00. Unlike some class cases in which consumers receive only a

nominal amount, the relief here can make a real difference in helping class members. These funds can be used by class members to cure defaults that were caused by Wells Fargo's improper payment change notices, where debtors paid lower installment amounts than what was required under the unmodified contract terms. Class members who have already benefitted from remediation on their accounts are still permitted to receive a cash distribution. The method of distribution will also benefit class members as settlement funds will be sent automatically by the settlement administrator. Class Counsel's knowledge of bankruptcy practice helped them to appropriately weigh the relative harm to class members from Wells Fargo's practices in determining the distribution levels for the settlement funds.

32. For the reasons stated above, based on the circumstances of this case and accounting for the case's difficulties and the results obtained, it is my opinion that the requested fee of one-third of the common fund is reasonable and appropriate. My conclusion is reinforced by the special risks in this case undertaken by Class Counsel. While there is always the risk that a case accepted on a contingency basis will result in no fee at all, the unsettled nature of bankruptcy class actions and the unique subject matter here magnified the risk for Class Counsel. When weighing potential risks, class counsel often look to other similar litigation. Class Counsel in this case had few examples to use for comparison or as a benchmark. In fact, I am not aware of any similar successful class cases dealing with Rule 3002.1 that they could have considered.

33. Another factor related to risk is the anticipated response by the defendant. As Class Counsel surely contemplated, Wells Fargo took the position that its practices were completely proper and lawful. This was not a case where the defendant quickly rolled over and offered to settle. Rather, the settlement here was hard fought and came only after aggressive litigation, extensive discovery, and well-conducted mediated negotiations with a highly-regarded mediator.

34. In my opinion, the requested fee is also reasonable when viewed in terms of a lodestar "cross-check." Using a lodestar cross-check in this case results in a multiplier of 3.24 (which will be further reduced in the future as additional work is done by class counsel). This multiplier is justified based on the special skills, risks and difficulties encountered in this case. Given the contingent nature

10

and complexity of this case, I believe that a multiplier of this amount is needed to attract skilled counsel to undertake such litigation.

35. In addition to notice to the class members, copies of the class notices were sent to all Chapter 13 trustees in the nation, even though they are not class members. I am informed that no objection has been made to the proposed settlement or the requested fee award by any class member or by any Chapter 13 Trustee. In my opinion, the absence of any objection in a consumer class action of this type helps to support my opinion that the fee request is fair and reasonable.

36. In forming my opinions, I reviewed the Plaintiffs' Second Amended Complaint, and exhibits thereto, Plaintiffs' Motion for Certification of Settlement Class and Preliminary Approval of Class Action Settlement Pursuant to Fed. R. Civ. P. 23 and Fed. R. Bankr. P. 7023, and exhibits thereto, including the Settlement Agreement, Plaintiffs' Motion and Memorandum of Law in Support of Plaintiffs' Motion for Attorneys' Fees and Non-Taxable Costs and Class Representative Service Awards, and exhibits thereto, and the bankruptcy court's Order Preliminarily Approving Settlement and Providing for Notice.

*/s/ John Rao*

John Rao
National Consumer Law Center, Inc.

Date: February 18, 2019